GILBERT BREEN and ELLEN BREEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Breen v. Comm'r
Docket No. 6612-77
United States Tax Court
T.C. Memo 1983-645; 1983 Tax Ct. Memo LEXIS 144; 47 T.C.M. (CCH) 137; T.C.M. (RIA) 83645; October 19, 1983. *144 Held: Respondent fails to prove, by clear and convincing evidence, that petitioner-husband filed a false or fraudulent return with the intent to evade tax and that the exception to the general period of limitations set forth in section 6501(c)(1), I.R.C. 1954, applies. Consequently, the assessment and collection of taxes from petitioners for 1966 are barred by the general period of limitations. Section 6501(a), I.R.C. 1954. Moe D. Karash, for the petitioners. Daniel O'Brien and Michael K. Phalin, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal individual income tax against petitioners for 1966 in the amount of $32,581.40 and an addition to tax under section 6653(b)[1] (fraud) against petitioner-husband for 1966 in the amount of $16,290.70. After a concession by respondent, the issues for decision are as follows: (1) Whether the assessment and collection of a deficiency for 1966 are barred by the statute of limitations (section 6501(a)) or allowed under an exception *145 to the general period of limitations (section 6501(c)(1)); and (2) If assessment and collection are not barred, then: (a) whether petitioners received unreported taxable income from unexplained bank deposits, constructive dividends, long-term capital gains, and interest from savings bank accounts; and (b) whether petitioners are entitled to deductions for certain contributions and entertainment expenses; and (c) whether petitioner-husband is liable for an addition to tax under section 6653(b). [2] FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition in the instant case was filed, petitioners Gilbert Breen (hereinafter sometimes referred to as "Gilbert") and Ellen Breen, husband and wife, resided in Hollis Hills, New York. *146 Pacific Stock Litigation
Gilbert and his brother, Matthew Breen (hereinafter sometimes referred to as "Matthew"), each owned 50 percent of the stock of three corporations until at least July 1968. [3] The three corporations were Aero Expediters, Inc. (hereinafter sometimes referred to as "Aero"), United Transfer Corporation (hereinafter sometimes referred to as "United"), and Breen Air Freight, Ltd. (hereinafter sometimes referred to as "Freight"). Aero, United, and Freight are hereinafter sometimes collectively referred to as "the Breens' companies." During Aero's fiscal years ending January 31 of 1966 and 1967, Gilbert was president of Aero, [4] which was located at 609 West 29th Street, New York City, New York. During United's fiscal years ending March 31 of 1966 and 1967, Gilbert was president of United, which was located at 624 West 24th Street, New York City, New York. During Freight's fiscal year ending November *147 30, 1966, Gilbert was president of Freight, which was located at 609 West 29th Street, New York City, New York. For many years before April 1963, Gilbert, Matthew, and the Breens' companies acted as agents for air freight forwarders and were engaged in air freight trucking in the New York City metropolitan area. During these years, Pacific Air Freight, Inc. (hereinafter sometimes referred to as "Pacific"), an air freight forwarder incorporated under the laws of the State of Washington, used the services of Gilbert and the Breens' companies. To induce Gilbert to give up his active participation in the air freight forwarding business and devote all of his time and energy to establishing an air freight forwarding business for Pacific in the New York City metropolitan area, Pacific offered to employ Gilbert on a full-time basis *148 and grant him an option to buy Pacific stock. Pacific also offered to appoint one of the Breens' companies, which would continue to be operated by Matthew, as Pacific's exclusive agent in the New York City metropolitan area. From April 1963 through November 15, 1965, Gilbert was employed by Pacific as vice-president of its eastern region. Gilbert was elected to Pacific's board of directors in or about February 1964. On or about April 22, 1963, Pacific and Gilbert entered into an agreement whereby Pacific agreed, among other things, to grant Gilbert an option to buy 5,000 shares of authorized but unissued $1.00 par common stock of Pacific for $1.10 per share. Sometime in November 1963, this part of the agreement was modified. In accordance with an agreement entered into on or about February 27, 1964, Pacific granted Gilbert an option to buy 10,000 shares of Pacific common stock at $1.10 per share and a further option to buy 26,475 shares of Pacific common stock at a price to be determined by Pacific's board of directors at or before the time that option was exercised. In February 1965, Gilbert exercised his options and entered into an agreement with Pacific to buy 36,475 shares *149 of Pacific common stock for a total of $40,122.50 (which amounts to $1.10 per share). In accordance with this agreement, Gilbert delivered to Pacific a check in the amount of $4,000 and an installment note, dated February 18, 1965, in the amount of $36,122.50. At or about the time Gilbert purchased the 36,475 shares, their market value was close to $400,000. On April 14, 1965, Gilbert executed an escrow pledge agreement whereby he pledged the 36,475 shares of Pacific stock, and his three shares of Aero stock, as security for the installment note given in partial payment of the 36,475 shares. The 36,475 shares of Pacific stock were represented by certificate no. 255. Certificate no. 255 contained the following legend on its face: These shares are issued pursuant to agreement that the said shares or any part thereof shall not be transferred, and no transfer shall be recognized, until Pacific Air Freight, Inc. (PAF) [Pacific] has been given a reasonable opportunity to purchase or otherwise acquire said shares upon terms at least equal to the terms upon which such shares are proposed to be transferred and in the event the holder of such shares shall cease to be a bona fide, full-time *150 employee of PAF or a bona fide, full-time employee of an exclusive agent for PAF, PAF shall have the option to purchase all or any part of such shares at $1.10 per share or at the book value thereof as reflected on its books of account as determined by its regular auditor, whichever sum be higher. During 1965, Gilbert made payments totalling $6,083 with respect to the purchase of the 36,475 shares. [5]
As of November 11, 1965, the 36,475 shares represented one-fourth of the voting shares of Pacific stock. Pacific, Aero, Gilbert, and Matthew entered into a written agreement dated May 15, 1965, whereby they agreed, among other things, to the following: 1. The termination and cancellation of a written agreement dated March 1, 1965, between Pacific and Aero for the sale and handling of air freight transportation to and from the New York area. 2. The termination and cancellation of an oral agreement between Pacific and Aero for the sale and handling of air freight transportation to *151 and from the Philadelphia area. 3. The withdrawal of Aero from the air freight forwarding business in the New York, Newark, and Philadelphia areas. 4. A covenant by Gilbert, Matthew, and Aero whereby they would not engage in a business like or similar to Pacific's within the commercial zones pertaining to New York City, Newark, and Philadelphia, for six years from the date of the agreement.
5. An agreement by Gilbert and Matthew to use their best efforts to obtain sales referrals and new business for Pacific. Pacific agreed to pay Aero, Gilbert, and Matthew, as consideration for the covenant nine percent of the first $40,000 in net gross revenues from Pacific's operations in the New York City, Newark, and Philadelphia commercial zones each month, for 72 months. For the sales referrals, Pacific agreed to pay Gilbert and Matthew, "or order", three percent of the net gross revenues from Pacific's operations in the New York City, Newark, and Philadelphia zones above $40,000 and up to $80,000 each month, plus one percent of such revenues above $80,000 each month, for the period May 15, 1965, to May 15, 1971. However, the sum of the payments on account of the sales referral agreement *152 was not to exceed $90,000. Over the life of this agreement, the Breens' companies received between $200,000 and $300,000. The May 15, 1965, agreement does not recite any money consideration for the termination of the agency agreements or Aero's agreement to withdraw from the air freight forwarding business in the New York City, Newark, and Philadelphia areas. On November 16, 1965, Pacific fired Gilbert. Pursuant to the terms stated on the legend on the face of certificate no. 255, supra, Pacific then tried to exercise the option to purchase all of Gilbert's 36,475 shares for $1.10 per share. On or about November 29, 1965, Gilbert timely tendered the payment due under the installment note for the month of November, but this payment was rejected by Pacific. On February 3, 1966, Gilbert began a suit against Pacific in the United States District Court, Southern District of New York. In his complaint, Gilbert asked the court to declare him the owner of the 36,475 shares of Pacific stock free and clear of any conflicting claim by Pacific and to enjoin Pacific (1) from taking any action which might tend to impair his rights in the stock or (2) from dealing with the stock as if Pacific *153 were the owner.Gilbert was represented in this action by attorneys Harold Epstein (hereinafter sometimes referred to as "Epstein") and Murray Schwartz. On February 16, 1966, Pacific began a suit against Gilbert in the United States District Court, Western District of Washington. In its complaint, Pacific asked the court to order specific performance of the agreement referred to in the legend on certificate no. 255, that Pacific was to have the right to purchase the 36,475 shares at a price of $1.10 per share. Between the time these suits were started and April 20, 1966, Gilbert decided to settle the suits because he needed money to go back into the air freight trucking business and had no additional funds to spend on litigation. On April 20, 1966, Gilbert and Pacific executed an agreement in settlement of both of the actions (hereinafter sometimes referred to as "the settlement agreement").Matthew was not a signatory to the settlement agreement. Under the settlement agreement, Gilbert and Pacific agreed, among other things, to the following: (1) To cancel the buy-sell agreement concerning the 36,475 shares entered into by Gilbert and Pacific in February 1965. (2) To cancel the *154 installment note dated February 18, 1965, which had been delivered by Gilbert to Pacific in partial payment for the 36,475 shares. (3) To cancel the escrow pledge agreement executed by Gilbert on April 14, 1965. (4) To execute stipulations for the dismissal, with prejudice, of the suits brought by Gilbert and Pacific. (5) To cancel certificate no. 255 on Pacific's books and records, this cancellation being "deemed to satisfy any and all obligations which Breen [Gilbert] may have had with respect to the restriction endorsed on the face of said certificate." (6) To have Pacific issue to Gilbert a new stock certificate, certificate no. 260, for 10,000 shares of common stock, "effective as of February 18, 1965 (the date of issue of said certificate no. 255)", for a total consideration of $11,000, or $1.10 per share. This consideration was to be paid as follows: the $6,083 which Gilbert had paid during 1965 for the 36,475 shares was to be credited toward the consideration and Gilbert was to pay, by cash or certified check, the balance of $4,717. [6] *155 In connection with the settlement, Gilbert signed an investment letter which stated in part as follows: I hereby warrant and represent that I am acquiring the Stock for my own account for investment; that I am not acquiring the Stock with a view to dividing my participation with others or with a view to, or in connection with, any offering or distribution thereof; and that I have no present intention of selling or otherwise disposing of any of the Stock. The undersigned understands that the effect of this representation is that I do not now intend to sell or otherwise dispose of all or any part of the Stock, unless and until I determine at some future date that changed circumstances not now contemplated make such sale or other disposition advisable, and I do not now have in mind selling or otherwise disposing of the Stock upon the occurrence or non-occurrence of some predetermined event. The undersigned agrees that you [Pacific] shall not be required to make, permit, or recognize *156 any exchange, transfer, or assignment of the Stock unless the undersigned shall furnish you at the time thereof with an opinion of counsel satisfactory to you and your counsel to the effect that such exchange, transfer, assignment or issue would not involve any violation of the Securities Act of 1933 or any similar or superseding statute or statutes as then in effect, or any other applicable statute or regulation. Notwithstanding his representations in this investment letter, Gilbert entered into a simultaneous agreement with the New York City investment firm of Faulkner, Dawkins & Sullivan (hereinafter sometimes referred to as "Faulkner") whereby Faulkner agreed to purchase Gilbert's 10,000 shares for a price of $12.50 per share, less a commission fee of $ .576 per share, or a net price of $11.924 per share. This transaction took place at a formal closing held on April 20, 1966, at the offices of Royall, Koegel & Rogers (hereinafter sometimes referred to as "Royall"), a New York City law firm acting on behalf of Faulkner. At this closing, Faulkner issued a check in the amount of $115,000, payable to Gilbert, and Royall issued a check in the amount of $4,240, payable to Gilbert. *157 Gilbert then delivered the checks, totalling $119,240, to Epstein for deposit in Epstein's trust account and Epstein executed and delivered to Gilbert a receipt for the checks. Gilbert, in turn, delivered to Faulkner the certificate evidencing the 10,000 shares. A receipt was executed at the closing by a representative of Faulkner and by Gilbert which stated as follows: The undersigned, Faulkner, Dawkins and Sullivan acknowledges receipt from Gilbert Breen of Certificate No. 260 evidencing 10,000 shares of the common stock of Pacific Air Freight Inc. registered in the name of Gilbert Breen and duly endorsed for transfer, and the undersigned, Gilbert Breen, acknowledges receipt of checks payable to his order in the total sum of $119,240.00, being payment in full for the aforementioned 10,000 shares of common stock. [7]
Faulkner delivered to Gilbert a letter dated April 20, 1966, warranting that the transaction between it and Gilbert regarding the 10,000 shares was in accordance with *158 the investment letter signed by Gilbert, and agreeing to hold Gilbert harmless from and against any claim of violation of the Securities Act of 1933 by reason of the transaction. By April 22, 1966, Epstein sent Gilbert a check in the amount of $97,812.26. This amount represented the total amount of the checks received by Epstein at the closing ($119,240), minus an amount for Epstein's fee and disbursements ($21,427.74). By a letter dated April 23, 1966, Gilbert informed Epstein that he had "reviewed the closing memorandum and letter pertaining to the fee computation with my accountant and we find that an arithmetic error was obviously made." As a result, Gilbert stated, he had overpaid his legal fee to Epstein by the amount of $1,200. On May 25, 19668 Epstein reduced his fee by $1,200 and sent a rebate check in that amount to Gilbert. On April 25, 1966, Gilbert and Matthew took the check sent by Epstein in the amount of $97,812.26, to the First National City Bank, John F. Kennedy Airport Branch (hereinafter sometimes referred to as "the Bank") and used it to open two checking accounts. [8] One checking account, numbered XXXX4496, was opened at the Bank in the name of "Gilbert Breen" *159 with an initial deposit of $55,416.13. The other checking account, numbered XXXX4488, was opened at the Bank in the name of "Matthew Breen" with an initial deposit of $42,396.13. Gilbert did not attempt to conceal the funds, nor did he use fictitious names for the accounts. Gilbert and Matthew had an understanding that they were 50/50 partners in every transaction that took place in their business activities. Gilbert attended the New York University School of Commerce for two years, majoring in industrial relations. During that time, he took a course in principles of accounting and a course in economics. Petitioners filed Federal individual income tax returns for 1964, 1965, and 1966. These tax returns were prepared by Philip Levine (hereinafter sometimes referred to as "Levine"), but only the 1964 and 1965 tax returns were signed by Levine as "preparer". Levine is Gilbert's brother-in-law and his accountant. Levine also was the accountant for the Breens' companies from 1951 through 1968. For a period of about one year ending in January 1966, Levine was the secretary-treasurer of the *160 Breens' companies. Petitioners reported on their 1964 income tax return a long-term capital gain from the sale of a frame building in the amount of $4,077.91. [9] Petitioners reported on their 1965 income tax return a long-term capital gain from the sale of a residence in the amount of $4,537.35. [10] Gilbert notified Levine, who prepared these returns, of these transactions. Levine also had independent, personal knowledge of the sales of the frame building and the residence. Gilbert relied on Levine to properly report petitioners' income on their income tax returns. The settlement agreement was not reflected on petitioners' 1966 income tax return. Savings Account Interest
Interest income was earned during 1966 in certain savings accounts as reflected in table 1. Table 1 Account
Interest Income
First Federal Savings & Loan No. 4724
I/N/O Ellen Breen I/T/F Richard Breen
$ 48.09 [1]
First Federal Savings & Loan No. 9718
I/N/O Ellen Breen
231.72 [1]
Long Island Savings & Loan No. 78676
I/N/O Gilbert or Ellen Breen
300.99 [1]
Hamburg Savings & Loan No. 18672
I/N/O Gilbert or Ellen Breen
125.22 [1]
Central Queens Savings & Loan No. 901338
I/N/O Gilbert Breen Cust. Rich Breen
137.44 [2]
Central Queens Savings & Loan No. 901339
I/N/O Ellen Breen Cust. Rona Breen
176.98 [2]
First Federal Savings & Loan No. 10651
I/N/O Ellen Breen Cust. under N.Y. Gift
to Minors for Richard Breen
190.47 [2]
First Federal Savings & Loan No. 10652
I/N/O Ellen Breen Cust. under N.Y. Gift
to Minors - Ron Breen
176.12 [2]
First Federal Savings & Loan No. 10650
I/N/O Ellen Breen
411.28 [3]
First Federal Savings & Loan No. 12286
I/N/O Ellen Breen I/T/F Ronrich Breen
389.46 [3]
Central Queens Savings & Loan No. 901145
I/N/O Gilbert or Ellen Breen
215.61 [3]
Metropolitan Federal Savings No. 14089
I/N/O Ellen Breen I/T/F Ronrich Breen
133.34 [3]
Total
$2,536.72   *161 Other Matters
Petitioners filed their joint Federal individual income tax return for 1966 on or before April 15, 1967. The notice of deficiency was mailed to petitioners on May 18, 1977. On their 1966 income tax return, petitioners reported adjusted gross income of $24,797.40 and taxable income of $19,067.40. In the notice of deficiency, respondent made adjustments (in addition to those relating to the settlement agreement and the savings accounts) increasing taxable income as follows: unexplained bank deposits--$5,500; constructive dividends (ordinary income)--$14,053.82; constructive dividends (long-term capital gain)--$8,121.86 (less the 50 percent sec. 1202 deduction); unsubstantiated charitable contributions deduction--$422; and unsubstantiated entertainment expense deduction--$150. Respondent also reduced taxable income by $30.52 for additional interest expense. On *162 April 3, 1973, an indictment was filed against Gilbert in the United States District Court, Eastern District of New York, charging Gilbert with a violation of section 7201 (willful attempt to evade or defeat tax) and 7206(1) (false tax return) for 1966. This indictment resulted from the relationship between Gilbert and Pacific and the transaction between Faulkner and Gilbert at the closing. A nonjury trial on this indictment was held on July 23, 1973.At the end of the trial, Gilbert's counsel, Kalman V. Gallop, moved to dismiss "on the ground that the Government has failed to meet its burden of proof and failed to prove the elements of the crime beyond a reasonable doubt." This motion was granted and the indictment was dismissed by an order dated July 23, 1973. OPINION Collateral Estoppel
As a preliminary matter, we deal with petitioners' assertion that respondent is collaterally estopped from proving willfulness. At trial, petitioners moved to introduce certain stipulations and exhibits relating to an indictment filed against Gilbert for alleged violations of sections 7201 (willful attempt to evade or defeat taxes) and 7206(1) (false tax return), the trial of the criminal case *163 resulting from the indictment, and the subsequent dismissal of the indictment.Petitioners contended at that time that respondent is collaterally estopped from proving willfulness in the instant case. We ruled that the stipulations and exhibits be received into evidence, but that respondent is not collaterally estopped from maintaining that Gilbert is liable for additions to tax under section 6653(b). On brief, petitioners renew their argument as to collaterial estoppel and contend as follows: [W]hile the Government is not collaterially estopped from maintaining this action because of a prior decision of the Federal Court with regard to Gilbert Breen alone, the specific fact of whether said petitioner had WILLFULLY failed to report any income alleged to be taxable in the subject year (1966) has been established. To the extent that such finding as to the matter of WILLFULNESS having once been decided upon in a Federal Court of competent jurisdiction is collateral estopped as to this later proceeding. As to the element of fraud, section 6653(b) and the section relied on by petitioners--section 6501 (c)(1)--are in pari materia. See Asphalt Industries, Inc. v. Commissioner, 384 F2.d *164 229, 232 (CA3 1967), revg. on other grounds 46 T.C. 622 (1966); McGee v. Commissioner,61 T.C. 249, 261 (1973), affd. 519 F.2d 1121 (CA5 1975); Vannaman v. Commissioner,54 T.C. 1011, 1016-1017 (1970). Consequently, on this point we generally will consider section 6653(b) cases and section 6501(c)(1) cases interchangeably. In a criminal fraud case, respondent must prove every element of fraud beyond a reasonable doubt. Holland v. United States,348 U.S. 121, 138-139 (1954); United States v. Cruz,698 F.2d 1148, 1150 (CA11 1983); United States v. Dwoskin,644 F.2d 418, 419 (CA5 1981). Gilbert's victory in the criminal tax fraud case means merely that respondent did not prove every element beyond a reasonable doubt. Helvering v. Mitchell,303 U.S. 391, 397 (1938). Collateral estoppel "applies only with respect to those facts actually litigated in the first case which were essential to the judgment in that case." Goodwin v. Commissioner,73 T.C. 215, 223 (1979) (emphasis supplied). Once it is determined in the criminal case that respondent has failed to prove some element beyond a reasonable doubt, it is not essential to the decision in that case to determine whether the proof met *165 some lower standard such as "clear and convincing evidence" or "preponderance of the evidence". Accordingly, it is of no significance for collateral estoppel purposes that, in Gilbert's criminal case, the trial judge stated, as part of his analysis leading to the granting of Gilbert's motion to dismiss, that "I cannot escape a substantial doubt, which is even more than a reasonable doubt in this case." [11]
We repeat what we believe is the clear import of our order that respondent is not collaterally estopped by the dismissal of the indictment against Gilbert in the criminal fraud case from asserting fraud in the instant case. Helvering v. Mitchell,303 U.S. at 397-398; [12] *166 *167 Stratton v. Commissioner,54 T.C. 255, 283-284 (1970). Statute of Limitations
Petitioners have properly raised in their petition the affirmative defense of the statute of limitations under section 6501(a). Rule 39. [13] On brief, petitioners rely solely on this defense and do not address the issues relating to the amount of the deficiency or to the addition to tax under section 6653(b). Respondent contends that the instant case falls within the exception to the general period of limitations set forth in section 6501(c)(1) for two alternative reasons.Firstly, respondent contends that Gilbert "intended to evade his income taxes within the purview of I.R.C. section 6653(b) when *168 he deliberately failed to advise [Levine]". Secondly, and alternatively, Gilbert and Levine participated together in a scheme to intentionally exclude income from petitioners' 1966 tax return. We agree with petitioners. In general, section 6501[14] *169 bars assessment of an income tax deficiency more than three years after the later of (1) the date the tax return was filed or (2) the date the tax return should have been filed. If the taxpayer makes out a prima facie case that the notice of deficiency was mailed more than three years after the later of the filing date or the due date, then respondent has the burden of pleading and proving the existence of an exception to the general period of limitations. FarmersFeed Co. v. Commissioner,10 B.T.A. 1069 (1928). In the instant case, petitioners have made out a prima facie case by pleading the statute of limitations as an affirmative defense in their petition and by proving that their tax return for 1966 was filed on or before April 15, 1967, more than ten years before the date the notice of deficiency was mailed in the instant case (i.e., May 18, 1977). Respondent concedes as much. Respondent raises the exception to the general period of limitations set forth in section 6501(c)(1). [15]Respondent has the burden of proving the existence of this exception. Farmers Feed Co. v. Commissioner,supra. This burden is the same as that which respondent bears under section 6653(b). AsphaltIndustries, Inc. v. Commissioner, 384 F.2d at 232; BotwinikBrothers of Mass., Inc. v. Commissioner,39 T.C. 988, 996 (1963). To carry this burden, respondent must prove fraud *170 by clear and convincing evidence. (Sec. 7454(a); [16] Rule 142(b); see e.g., Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105, 114 (1969).) The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner,465 F.2d 299, 303 (CA7 1972), affg. a Memorandum Opinion of this Court; [17]Mensik v. Commissioner,328 F.2d 147 (CA7 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner,56 T.C. at 224; Stratton v. Commissioner,54 T.C. at 284. *171 Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. E.g., Webb v. Commissioner,394 F.2d 366, 377 (CA5 1968), affg. a Memorandum Opinion of this Court; [18]Powell v. Granquist,252 F.2d 56, 60 (CA9 1958); Wiseley v. Commissioner,185 F.2d 263, 266 (CA6 1950), revg. 13 T.C. 253 (1949); Estate ofPittard v. Commissioner,69 T.C. 391, 400 (1977); McGee v. Commissioner,61 T.C. at 256-257. This intent may be inferred from circumstantial evidence. Powell v. Granquist,252 F.2d at 61; Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. in unpublished opinion 578 F.2d 1383 (CA8 1978); Beaver v. Commissioner,55 T.C. 85, 92-93 (1970). In the notice of deficiency, respondent made many adjustments to petitioners' taxable income, [19] each of which increased petitioners' income tax liability for 1966. In his contentions as to fraud, respondent relies only on the omission of profit from the settlement agreement (which increases taxable income by $44,106.13) and the omission of interest income from four of the savings bank accounts (which increases taxable income by $1,149.69). *172 [20] We will consider, on the question of fraud, only the omissions on which respondent relies. See Estate of Fusz v. Commissioner,46 T.C. 214, 215 n. 2 (1966). Viewing the record as a whole, we conclude that respondent has failed to prove fraud by clear and convincing evidence. Respondent points to the following items as support for a conclusion that petitioners' 1966 income tax return was fraudulent with the *173 intent to evade tax: (1) Petitioners failed to report on their tax return Gilbert's profit from the settlement agreement and interest income from four savings accounts. (2) The settlement agreement was too extraordinary, and the profit from it was too large, for Gilbert and Levine to have overlooked the matter in signing and preparing the 1966 tax return. (3) Either Gilbert deliberately failed to notify Levine of the settlement agreement or Gilbert and Levine (Gilbert's brother-in-law) acted inconcert ("contrived family strategy") to exclude information about the settlement agreement from the 1966 tax return. (4) Levine failed to sign petitioners' 1966 tax return as return preparer, even though he had so signed petitioners' 1964 and 1965 tax returns.
(5) Gilbert "was a highly sophisticated business executive who had attended two years of college and had regularly utilized the services and expertise of the same accountant since the year 1951." The parties have stipulated as to how much interest income was earned on each of 12 savings accounts in the name of one or both petitioners in 1966.Petitioners reported income from four of these accounts. Respondent concedes that he erred in *174 determining that income from another four of these accounts is taxable to petitioners. As to the remaining four accounts, we note that all are in the names of one or both petitioners, that two are in the same savings and loan association as two of the accounts the interest from which was reported on petitioners' 1966 income tax return, and that one was in the same savings and loan association as two of the accounts the interest from which respondent concedes is not taxalbe to petitioners. (See table 1, supra.) Petitioners do not appear to have concealed the accounts. The record does not include any evidence (much less clear and convincing evidence) that, as to any of these four accounts, Gilbert was aware of the income, believed it was taxable to him, and intentionally omitted it from petitioners' 1966 income tax return. We conclude that the omission from the tax return of interest income from four of the savings accounts does not lend support to respondent's contention that Gilbert committed fraud. The evidence as to the settlement agreement is more troubling. However, we note the lack of concealment of the proceeds of the transaction. These proceeds were deposited by Gilbert *175 and Matthew in checking accounts in their own names. Further, respondent has not presented any evidence of a pattern of nonreporting or underreporting. We have no evidence of refusal to cooperate with respondent, of concealment of records, of lying to agents or of attempts to "drop out" of the tax system by failing to file tax returns. Too, respondent seems to have some uncertainty as to how the settlement agreement should have been reported. He asserts that the 10,000 shares were acquired and sold on the same day, yet he determined the gain to be long-term capital gain. Also, in the instant case respondent attributes all the proceeds of the settlement agreement to Gilbert and ignores the fact that Gilbert gave close to half of this amount to Matthew. In the criminal case, respondent attributed to Gilbert only the amount that Gilbert retained. Respondent presents no explanation of his "waffling" on this matter. For respondent to sustain his position as to the statute of limitations, it is not enough that respondent makes us suspicious of the taxpayer or even that respondent proves fraud by a preponderance of the evidence. See Kreps v. Commissioner,351 F.2d 1, 7 (CA2 1965), *176 affg. 42 T.C. 660 (1964); Shaw v. Commissioner,27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (CA6 1958); Gano v. Commissioner,19 B.T.A. 518, 532-533 (1930).The evidence must be clear and convincing. In the instant case, the evidence falls short of being clear and convincing. [21]
We hold for petitioners. Because we conclude that the assessment and collection of taxes in the instant case are barred by the statute of limitations, we do not reach the issues of unreported income, unsubstantiated expenses, and the addition to tax. * * * To the concern that all liability for tax should not be avoided merely because respondent failed to bear his high burden of proof as to fraud, we make two responses. Firstly, the interaction of the statute of limitations with the requirements as to fraud represents a compromise between two public policies determined by the Congress. People should be required to pay their *177 tax liabilities. But the Congress also has provided "that after a determinate period of time citizens can rest assured that their tax returns will not be reopened by zealous tax officials." Kreps v. Commissioner,351 F.2d at 4. Secondly, we note that Gilbert was indicated on April 3, 1973, within the six-year limitations period provided for in section 6501(e). A notice of deficiency mailed at that time might well have withstood the defense of the statute of limitations. [22]
Decision will be entered for the petitioners.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue.↩
2. Respondent concedes that petitioner-wife has no liability for the fraud addition to tax. Nevertheless, proof of fraud on the part of petitioner-husband would keep the statute of limitations open as to petitioner-wife. Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F. 2d 87 (CA1 1972); Stone v. Commissioner,56 T.C. 213, 227-228↩ (1971).
3. In July 1968, the three corporations were merged with Haven Industries, Inc. The record does not indicate if any of the three corporations remained as the surviving corporation and whether Gilbert and Matthew continued as shareholders of the surviving corporation.↩
4. So stipulated. Petitioners introduced into evidence (without objection by respondent) an exhibit which purports to have been signed by Matthew as president of Aero on June 8, 1965, well within Aero's fiscal year ending January 31, 1966. The parties have not favored us with an explanation of the apparent discrepancy between their stipulation and the exhibit.↩
5. The payment consisted of the $4,000 payment made by check pursuant to the agreement entered into sometime in February 1965, and other payments totalling $2,083 made after February on the installment note.↩
6. Addition of the amount credited ($6,083) and the amount to be paid ($4,717) produces a sum of $10,800, or $200 less than the stated consideration. Gilbert's letter of April 22, 1966, to Epstein also states that Gilbert's cost for the 10,000 shares was $10,800. The parties have not explained this $200 difference. We leave the parties as we find them.
7. The stipulated text of the receipt differs in several respects from the text of the stipulated receipt. Our finding is in accordance with the stipulated text. The differences appear to be irrelevant.↩
8. The parties do not explain what was done with the rebate check for the amount of $1,200.↩
9. This was offset by a short-term capital loss of $5,300 from the forfetiure of a deposit in connection with an option to purchase property. ↩
10. This was offset by a carryover of the $222.09 unused portion of the 1964 net short-term capital loss.↩
1. These amounts, totalling $706.02, were reported by petitioners on their 1966 income tax return. ↩
2. These amounts, totalling $681.01, were conceded by respondent not to be income taxable to petitioners. ↩
3. These amounts, totalling $1,149.69, were not reported by petitioners but are conceded to be taxable to them.↩
11. Having concluded that collaterial estoppel does not operate because of the differences in the issues, we need not decide whether this case presents questions as to ultimate fact versus mediate datum. Compare The Evergreens v. Nunan,141 F.2d 927 (CA2 1944), affg. 47 B.T.A. 815 (1942), with Goodwin v. Commissioner,73 T.C. 215↩ (1979).
12. In Helvering v. Mitchell,303 U.S. 391, 404-405 (1938), the Supreme Court presented the following analysis in the course of disposing of Mitchell's double jeopardy claim: 4.The fact that the Revenue Act of 1928 contains two separate and distinct provisions imposing sanctions, and that these appear in different parts of the statute, helps to make clear the character of that here invoked. The sanction of fine and imprisonment prescribed by § 146(b) for wilfull attempts "in any manner to evade or defeat any [income] tax," introduced into the Act under the heading "Penalties," is obviously a criminal one. The sanction of 50 per centum addition "if any part of any deficiency is due to fraud with intent to evade tax," prescribed by § 293(b), introduced into the Act under the heading "Additions to the Tax," was clearly intended as a civil one. This sanction, and other additions to the tax, are set forth in Supplement M, entitled "Interest and Additions to the Tax." [Fn. ref. omitted.] The Congress, in its consideration of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324), described section 6653(b) as imposing a "fraud penalty". See the heading of section 325 of the Act and the relating clause in the text of section 325(a) of the Act (96 Stat. 616); H. Rept. (Conference Rept.) 97-760, p. 577, 1982-2 C.B. 600, 651. Petitioners have not raised the double jeopardy question in the instant case, and so we do not determine whether the recent Congressional pronouncements as to the nature of section 6653(b) affect the constitutionality of respondent proceeding in the instant civil case after losing the criminal case against Gilbert. See Golden Rule Church Association v. Commissioner,41 T.C. 719, 731↩ (1964).
13. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
14. Section 6501 provides, in pertinent part, al follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this thitle shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. (b) Time Return Deemed Filed.-- (1) Early return.--For purposes of this section, a return of tax imposed by this title, * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.↩
15. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
16. SEC. 7454.BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary. [This language reflects amendments since 1966 which have no effect on the instant case.]↩
17. T.C. Memo. 1970-274↩.
18. T.C. Memo. 1966-81↩.
19. These adjustments, totalling $70,123.38, include two unexplained bank deposits, four constructive dividends, one sale of stock, omissions of interest income from eight savings bank accounts, a partial disallowance of charitable contribution deductions, and a disallowance of entertainment expenses. To offset this, respondent allowed an additional deduction of $30.52 interest expense. ↩
20. Respondent need not prove the precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States,466 F. 2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner,465 F.2d 299, 303 (CA7 1972), affg. T.C. Memo. 1970-274; Kreps v. Commissioner,351 F.2d 1, 6 (CA2 1965), affg. 42 T.C. 660↩ (1964).
21. In order to avoid uncertainty about the matter, it may be appropriate to note that this conclusion is based on the trial and the record in the instant case and not on the evidence presented in the criminal case and the conclusion reached by the trial judge in the criminal case.↩
22. We note, however, that in such a situation the respondent bears the burden of proof and must establish that the taxpayer failed to report gross income in an amount that is more than 25 percent of the amount of gross income reported on the return.See Bardwell v. Commissioner,38 T.C. 84, 92 (1962), affd. without discussion of this issue, 318 F.2d 786↩ (CA10 1963).